## ATLAS INTERMODAL TRUCKING SERVICE, INC., Respondent,

v.

## UNITED FIRE & CASUALTY COMPANY, Appellant.

### No. 72565.

Missouri Court of Appeals, Eastern District, Division Three.

July 31, 1998.

Thomas J. Noonan, St. Louis, for appellant.

Russell F. Watters, T. Michael Ward, St. Louis, for respondent.

CRANDALL, Judge.

United Fire & Casualty Co. appeals the grant of summary judgment in favor of Atlas Intermodal Trucking Service, Inc. We reverse and remand.

Anheuser–Busch, Inc. (AB) brought an action for breach of contract and breach of warranty against Crown Cork & Seal Co., Inc. (CCS) in the U.S. District Court for the Eastern District of Missouri. AB made the following allegations. CCS manufactures and distributes bottle caps also referred to as crowns that are affixed to the top of beer bottles. On March 7, 1991, CCS shipped 61,600 gross of the crowns to AB's Van Nuys brewery. AB received the crowns on March 15, 1991. Three days later, AB began bottling its beer using the crowns it received on

March 15, 1991. On April 12, 1991 and for the next several days, AB received complaints that bottles of its beer had an "off-flavor and a musty, moldy odor." AB determined that all allegedly contaminated bottles were capped with the March 15 crowns. Chemical analysis revealed that some of the beer produced with the March 15 crowns was contaminated by trichloranisole (TSA), "an odorous compound used in pesticides/fungicides." Subsequent analysis revealed that the container used to ship the crowns was also contaminated by TSA. CCS and AB concluded that migration of the TSA from the floor boards of the shipping container to the crowns was the cause of the "off-flavor and musty odor" in AB's beer. AB destroyed approximately 175,000 cases of beer that were capped with the March 15 crowns.

CCS brought a third party action against Intermodal Management Co. in business as Genex Terminal Co. (Genex) for breach of contract and negligence.[1] CCS alleged it entered into a contract with Genex, a freight broker, where Genex agreed to arrange for shipment of the March 15 crowns to AB's Van Nuys brewery. CCS also alleged the container used for the crowns was transported "via arrangements made by Genex, the freight broker." CCS sought damages for the amount it paid in settlement to AB and also sought additional damages, fees, and costs.

Genex brought a fourth party action against Atlas Intermodal Trucking Service, Inc. (Atlas Intermodal) for breach of contract, negligence, Carmack Amendment liability, indemnification, and contribution.[2] Genex alleged it "contacted Atlas [Intermodal] to pick up an empty container, inspect the empty container to ensure its safety and suitability for the transportation of commodities, transport the empty container to CCS, load and/or inspect the loading and count of the CCS crowns, and deliver the loaded container to the origin rail ramp at Remington, Indiana, for subsequent transportation to Los Angeles, California." Genex alleged further that Atlas Intermodal or one of its

---

1. CCS also named Mitsui O.S.K. Lines, Inc. and MOL Intermodal, Inc. as third party defendants.

2. Genex also named W.H. Wickersham & Co., Inc. and Williams Dimond & Co. as fourth party defendants.

authorized agents, representatives, or subcontractors picked up the container used to transport the March 15 crowns, transported the container to CCS for loading, and transported the loaded container from the CCS facility to the origin rail ramp in Remington, Indiana. Genex asked the court to order Atlas Intermodal to pay all or a proportionate share of sums that may be adjudged against Genex in favor of the third party plaintiff.

Thereafter, Atlas Intermodal brought an action against United Fire & Casualty Co. (United) for declaratory judgment and breach of contract. Atlas Intermodal alleged that United issued a commercial general liability policy to Atlas Intermodal that was effective from February 1, 1991 to February 1, 1992. Atlas Intermodal alleged further that despite proper notice of the claim and the underlying fourth party suit, United "wrongfully and without reasonable basis" refused to defend. Atlas Intermodal sought $53, 936.96 for defense costs and $75, 000 for settlement costs. In its answer, United asserted as one affirmative defense that under the terms and exclusions of the insurance policy, it did not have a duty to defend or indemnify Atlas Intermodal.

The following is derived from certain exhibits including the depositions of Dallam Thompson, Michael Thompson, and Duane Schumacher. United is an Iowa corporation. Atlas Intermodal was incorporated in Illinois in 1985. Atlas Warehouse Co. was incorporated in Iowa in 1936. Duane Schumacher, a Cedar Rapids, Iowa insurance agent, handled all insurance policies for the companies including the one at issue here. Atlas Intermodal with an address in Galesburg, Illinois and Atlas Warehouse Co. with an address in Burlington, Iowa are listed on the policy. The "policy period" is shown as being from February 1, 1991 to February 2, 1992. The policy has Illinois endorsements regarding cancellation and renewal, punitive or exemplary damages, and child molestation exclusion. In February 1991, Dallam Thompson served as President of Atlas Warehouse Co. and as Vice-President of Atlas Intermodal. He owned all the stock of the two companies. Michael Thompson served as President of

Atlas Intermodal in February 1991. Prior to February 1991, Atlas Warehouse performed "general" trucking. Atlas Intermodal began its "general" trucking operation on February 1, 1991 when Atlas Warehouse Co. sold its trucks and "moved over" its employees to Atlas Intermodal. Dallam Thompson stated that the corporate headquarters for Atlas Intermodal was in Iowa but that the "Illinois charter says it's in Galesburg." Michael Thompson worked in Galesburg, Illinois and he stated "[b]asically I was in charge" of Atlas Intermodal's total operation except for accounting functions including payroll, workers' compensation, and insurance functions which were all performed in Burlington, Iowa. Dallam Thompson worked in Burlington, Iowa and he handled all insurance matters relating to Atlas Intermodal. Atlas Intermodal's Remington, Indiana office was the "dispatch office" involved with the tractor and container used to pick up the crowns. Repairs on the trucks were performed at "various locations" depending on where they were located, such as Galesburg, Illinois, Remington, Indiana, or Iowa.

Atlas Intermodal and United filed motions for summary judgment. The court granted Atlas Intermodal's motion and denied United's motion. In its judgment, the court stated that Illinois law was applicable. Interpreting Illinois law, the court held that United had a duty to defend Atlas Intermodal in the fourth party action brought by Genex, insurance coverage was not barred by certain policy exclusions, and United was estopped from disclaiming coverage. The court awarded Atlas Intermodal $75,000 for the settlement, $53,936.96 for the defense costs, and prejudgment interest. United filed a motion to reconsider. The court amended, as stipulated by the parties, the amount of prejudgment interest and denied United's motion in all other respects. This appeal followed.

When considering appeals from summary judgment, we review the record in the light most favorable to the non-movant, and give that party the benefit of all reasonable inferences. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). A party

moving for summary judgment "bears the burden of establishing a right to judgment as a matter of law on the record as submitted; any evidence in the record that presents a genuine dispute as to the material facts defeats the movant's prima facie showing." *Id.* at 382. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the nonmoving party's response to the summary judgment motion." *Id.* at 376. Appellate review is essentially de novo. *Id.* A trial court's entry of summary judgment will be affirmed if it is sustainable as a matter of law on any ground. *Weil v. Kirn,* 952 S.W.2d 399, 401 (Mo.App. E.D.1997).

United argues in its first point that the trial court erred in ruling that Illinois law is applicable. United asserts that under Missouri choice of law principles, Iowa law applied to interpretation of the insurance contract.

Missouri has adopted sections 188 and 193 of the Restatement (Second) of Conflict of Laws (1971) in deciding choice of law issues regarding insurance contracts. *Hartzler v. American Family Mut. Ins. Co.,* 881 S.W.2d 653, 655 (Mo.App. W.D.1994); *Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co.,* 716 S.W.2d 348, 358 (Mo.App. 1986). Section 188 titled "Law Governing in Absence of Effective Choice by the Parties" provides:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, will respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in [section] 6.

(2) In the absence of an effective choice of law by the parties (see [section] 187), the contacts to be taken into account in applying the principles of [section] 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in [sections] 189–199 and 203.

Section 193 is titled "Contracts of Fire, Surety or Casualty Insurance" and was relied on by the trial court. This section provides:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in [section] 6 to the transaction and the parties, in which event the local law of the other state will be applied.

United contends that under the language of comments a and b to section 193, section 188 should be used to determine the choice of law.

Comment a denominated as "Scope of section" provides in part:

There may be no principal location of the insured risk in the case of contracts for the insurance of things, such as ships, trucks, airplanes and railroad cars, that are constantly on the move from state to state. In such a case, the location of the risk can play little role in the determination of the applicable law. The law governing insurance contracts of this latter sort must be determined in accordance with the principles set forth in the rule of [section] 188. As to multiple risk policies, see Comment f.[3]

Comment b denominated "Principal location of risk" provides in part:

The example discussed in comment f is for a single policy insuring dwellings in three states.

---

**3.** Comment f addresses multiple risk policies that insure against risks located in several states.

The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this cannot be done, and where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states.

United relies on the following deposition testimony of Dallam Thompson:

Q. [ by United's counsel]. What type of work did Atlas Trucking do?

Mr. Dallam Thompson: It was a truckload carrier.

Q. Long—Over-the-road?

Mr. Dallam Thompson: Yes, over-the-road truckload carrier.

Q. How many states did it do business in? Any state that a truck would have to go through, I guess?

Mr. Dallam Thompson: Mainly the Midwest states, but we did get out farther on occasion.

Q. Probably 10 to 15 states?

Mr. Dallam Thompson: Oh, more than that.

■ Dallam Thompson's above quoted testimony creates a genuine issue of material fact regarding whether Atlas Intermodal trucks were "constantly on the move from state to state" as discussed in comments a and b. His statements indicate that the trucks went mainly in the Midwest states and into 10 or 15 states or probably more. In addition, Atlas Intermodal had an office in Remington, Indiana and it appears trucks were located at that facility. This is not a case where the result would be the same regardless of the choice of law. The choice of law and the appropriate standard depending on which state's laws are applied is determinative of the issues regarding the duty to

Although the policy at issue here insures Atlas Intermodal and Atlas Warehouse Co., analysis in the first instance is more proper under comments a and b.

defend or indemnify, estoppel, and interpretation of the insurance policy. These issues are dispositive as to whether Atlas Intermodal is entitled to recover. The evidence in the record presents a genuine dispute as to material facts and Atlas Intermodal failed to establish a right to judgment as a matter of law.

■ Contrary to United's assertion, however, Dallam Thompson's statements do not establish as a matter of law that Atlas Intermodal trucks were "constantly on the move from state to state" as discussed in comments a and b. There is simply a genuine issue of material fact regarding the amount of work performed in Illinois versus the amount of work performed in other states. Furthermore, the existence of a genuine issue of material fact regarding application of section 193 does not mean that this section is ignored and the choice of law is analyzed under section 188.[4] *See Hartzler*, 881 S.W.2d at 655–656 (holding that section 193 controlled for the automobile insurance policy at issue). "In an action *between the parties to an insurance contract*, the principal location of the insured risk is the most important contact to be considered in determining the applicable law." *Gilmore v. Attebery*, 899 S.W.2d 164, 169 (Mo.App. W.D. 1995)(citing *Hartzler*, 881 S.W.2d at 655; Restatement (Second) of Conflict of Laws section 193 (1969)).

United also contends that the trial court erred in relying on "incorrect findings of fact" in determining that Illinois law applied. The trial court relied in part on these findings in determining that Illinois law applied under section 193. United specifically challenges the following statements in the trial court's judgment, "Albeit the extent of [Atlas Intermodal's] operations outside of Illinois was not clear from the record, the Court concludes that Illinois has the most significant relationship to the dispute here. The policy was delivered to [Atlas Intermodal] in Illinois; the contract to transport the crowns was accepted in Illinois; the shipping con-

4. The trial court found that under section 188, the contacts were split between Iowa and Illinois. Because it is unclear whether the choice of law should be analyzed under section 193, we reject United's suggestion that we analyze whether Iowa law would apply under section 188.

tainers can be said to based in Illinois; and, quite simply, no state other than perhaps Indiana has any real stake in the controversy. The Court will apply Illinois law."

Atlas Intermodal listed a Burlington, Iowa address in response to United's interrogatory as to "where all correspondence regarding procurement of the policy and the policy itself were sent." Dallam Thompson testified by deposition that all correspondence regarding the insurance policy was received at the Burlington, Iowa office and nothing regarding the policy was sent to Galesburg, Illinois. The record does not support the trial court's finding that the policy was delivered to Atlas Intermodal in Illinois.[5] There is also insufficient evidence in the record to support a finding that the contract to transport the crowns was accepted in Illinois or that the shipping container was based in Illinois. To the extent the trial court relied on these findings to find Illinois law applied under section 193, the court erred. Accordingly, the trial court erred in granting summary judgment on the issue of liability in favor of Atlas Intermodal.

■ We also agree with United's argument that a genuine issue of material fact existed regarding the amount of damages. Atlas Intermodal alleged in its petition that it suffered damages of $75,000 in settlement costs and $53,936.96 in litigation costs. United denied these allegations in its answer. Atlas Intermodal's summary judgment motion does not assert any specific amount for damages and there is no evidence in the record to support specific settlement or litigation costs. Accordingly, Atlas Intermodal failed to establish a right to judgment as a matter of law on the issue of damages.

The judgment of the trial court is reversed and the cause remanded for further proceedings.

AHRENS, P.J., and KAROHL, J., concur.

**5.** Duane Schumacher did testify in the deposition that he and Dallam Thompson went to see Michael Thompson in Galesburg, Illinois one time. He also stated that he may have made a duplicate copy of an insurance manual "and did one over to Galesburg" but he could not "for sure remember." This does not support the trial court's finding.